CHAMBERLIN *v.* WAGAR.

1. Evidence—Value of Property—Assessment.
    The amount property is assessed at has some probative force although it is not determinative of its true worth.

2. INSOLVENCY—DEFINITION.

    A person is insolvent within the meaning of the fraudulent conveyance act when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured (3 Comp. Laws 1929, § 13393).

3. FRAUDULENT CONVEYANCES—INSOLVENCY—BANK STOCKHOLDER'S ASSESSMENT.

    In suit by receiver of failed bank to set aside transfer from bank stockholder to his son of half interest in partnership in wholesale and retail gas and oil business in order to satisfy judgment on account of $7,000 stockholder's liability, record showing that such transfer was made two years before bank failed and while it was still paying dividends and accumulating surplus and when transferor enjoyed $6,000 to $8,000 annual income and had other valuable property, *held,* insufficient to establish fraudulent intent or ensuing insolvency upon part of transferor or probability of stockholder's assessment at time transfer was made (3 Comp. Laws 1929, § 13393).

Appeal from Montcalm; Hawley (Royal A.), J. Submitted June 11, 1935. (Docket No. 69, Calendar No. 38,353.) Decided September 9, 1935.

Bill by William I. Chamberlin, receiver of the Edmore State Bank, against Harry E. Wagar and Guy E. Wagar to set aside assignment of an interest in a copartnership. Decree for plaintiff. Defendants appeal. Reversed.

*Frank A. Miller* and *Eldred & Gemuend,* for plaintiff.

*Brake & Davis,* for defendants.

BUTZEL, J. Plaintiff, as receiver of the Edmore State Bank, recovered a judgment against Harry E. Wagar on account of his $7,000 stockholder's liability in the failed bank. The instant suit was then

brought to set aside an assignment given by Harry E. Wagar to his son Guy E. Wagar of a one-half interest in the Lee Jordan Company, a copartnership engaged in the wholesale and retail gas and oil business, and in which for over seven years Lee Jordan and Harry E. Wagar had been equal partners. On July 1, 1930, Wagar transferred his interest to his son, Guy, in consideration of "one dollar and love and affection." Harry E. Wagar at the time was an active vice-president of the Edmore State Bank and owned $7,000 of its stock. The bank had been prosperous and during the years 1928 and 1929 had paid semi-annual dividends of five to seven per cent. each and shortly after July 1, 1930, paid a semi-annual dividend of seven per cent.

In 1928, Guy, who was about to graduate from the University of Michigan, was contemplating the study of law but was particularly interested in obtaining a position with a large rubber company, which would necessitate his going to South America for several years. His parents, anxious for him to return to Edmore, tried to persuade him that it would be to his advantage to do so. It is claimed that his father agreed to turn over to him the one-half interest in the Lee Jordan Company, if he would return home, settle down and make good. He did this and subsequently the assignment was made.

Harry E. Wagar had been a man of some means. On July 1, 1930, he owned other property in addition to his interest in the Lee Jordan Company, and the bank stock, which still appeared to be valuable at the time of the transfer. He held life insurance policies with cash surrender values aggregating over $2,000. The sum of $2,000, due him for accumulated profits from the Lee Jordan Company, was paid over to him shortly after July 1, 1930. He had a bank balance of $539, and owned $300 of liberty bonds and $5,000 of

real estate mortgage bonds. He had a large stock interest in the Edmore Grain & Lumber Company, which was considered valuable. He owned an automobile for which he had paid over $2,000 the previous year. He also owned, jointly with his wife, and not subject to his individual debts, a 120-acre farm, also a homestead in Edmore and a lake cottage. He also enjoyed an income from $6,000 to $8,000 a year, part of which was derived from bank dividends. He also received $15 a week for his services at the bank, and $25 a week from the Edmore Grain & Lumber Company, of which he was the active manager. He had an insurance business that netted him $1,000 a year. He owed the bank $1,000 and practically had no other liabilities. The bank at the time was paying dividends but had a large number of bonds and mortgages in default.

The depression did not begin until the latter part of 1929, though prior to that time symptomatic conditions appeared without being properly diagnosed. The difficulty in the instant case seems to arise through the court viewing the conditions at the time of the hearing through glasses darkened by the three years of depression following July 1, 1930, during which time values sank to a very low level. On July 1, 1930, there were $37,500 of bonds in default, the major portion of which were purchased from the United States Mortgage Bond Company of Detroit, evidently then in receivership. On August 23, 1930, in response to a letter from the State banking commissioner, the bank wrote that it had obtained information as to the status of the bonds and found the situation not as serious as it might appear to be; that most of them were in good standing from an investment standpoint; that the interest on many was being temporarily held by the receiver; that the condition should not affect the value of the loans, and

that it was anticipated the situation would be cleared in the near future. The letter would indicate that while there had been $43,800 of bonds previously in default, there were only $37,500 then in default. There also were defaults in real ·estate mortgages. The directors of the bank adopted a resolution that further payments of dividends be deferred until the assets, including defaulted bonds and those that might thereafter default, were properly provided for. There is testimony showing a large depreciation in the value of the bank's bonds and mortgages at the time; that bonds carried on the bank's books at $186,177.01 were only worth $139,974.88, thus showing a loss of $46,202.13; that real estate mortgages of the face value of $50,776 were worth $34,125, a difference of $16,651; that real estate carried at $8,876 was only worth $5,500; and that $3,111.60 of notes were of no value. The proof offered to show the shrinkage in the value of the bonds had but little evidentiary force. The witness based his opinion almost entirely on what he had been told by others. Very few of the bonds in question were listed on any exchange. The witness did not examine the properties set forth in the trust mortgages, securing the bonds. The ·depreciation in the value of the real estate securing the mortgages held by the bank was disputed by competent testimony. While the amount property is assessed at is not determinative of its true worth, it nevertheless has some probative force. The assessed values as shown by the testimony of the assessor were in many instances far in excess of the appraisals made by the witness for the plaintiff.

"A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." 3 Comp. Laws 1929, § 13393.

On July 1, 1930, it was not known that a further recession in values would occur. It was believed by many that prosperity would shortly return and that conditions would improve instead of becoming much worse. The bank had just paid a dividend, and transferred $1,000 to its surplus account. Its business had been prosperous, its failure two years later evidently not being foreseen, and it cannot be said that the transfer of the Lee Jordan stock made Harry E. Wagar insolvent, or that it was made with fraudulent intent, or that there was a probability of a stockholder's assessment at the time.

The decree of the lower court is reversed, with costs to defendants, and one will be entered dismissing the bill of complaint.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.