MYERS *v.* C. W. TOLES & CO.

1. Evidence — Corporations — Articles of Association — Public Record.

> The articles of association of a corporation become a matter of public record when filed with the secretary of State and the clerk of the county where the office of the corporation is located.

2. Appeal and Error—Guaranty—Replacement of Land Contracts—Evidence.

> Record in suit for accounting under guaranties by defendant corporate broker in land contracts on land contracts sold plaintiff *held,* not to substantiate plaintiff's claim that defendant corporation made a practice of giving a guaranty of replacement although in one instance defendant had replaced contracts and had given guaranties on three or four small contracts.

3. Guaranty—Breach of Contract—Waiver.

> In suit by purchaser of vendor's interest in various land contracts for accounting by corporate grantor under its contract of guaranty to replace land contracts which became in default with nondefaulted contracts carrying a like guaranty or to repurchase the contract, plaintiff *held,* not barred from recovery on contract of guaranty nor to have waived any rights where, after defendant guarantor had defaulted on its guaranty, he demanded and received the land contracts from it, notwithstanding provision of contract of guaranty that it remained in force only so long as original contract purchased or the one substituted therefor remained in possession of guarantor.

4. Corporations—President—Exorbitant Salary—Record.

> In suit against corporation for accounting in which plaintiff sought to hold its president and general manager for illegal dividends and exorbitant salaries, record *held,* not to indicate that the corporate defendant paid, or that defendant president received, an exorbitant salary.

5. SAME—ILLEGAL DIVIDENDS—REMEDY—STATUTES.

No recovery against defendant directors of defendant corporation is permitted for alleged illegal dividends paid them by latter defendant where they are not sued as stockholders and provisions of statute setting forth exclusive remedy for recovery of such corporate assets were not followed (Comp. Laws 1929, §§ 10018, 14480–14492).

6. SAME—TRANSFEREES OF ASSETS—CONSIDERATION—PREJUDICE.

In suit by plaintiff against a corporation and certain transferees of its assets in which it is sought to hold latter liable because they had received corporate assets, recovery is denied where such transferees did not receive assets without adequate consideration and such dealings as were had were not prejudicial to plaintiff.

7. APPEAL AND ERROR—QUESTIONS REVIEWABLE—SPECIFIC TAX ON LAND CONTRACTS—PARTIES.

Whether or not land contracts were subject to specific tax is not decided on appeal in suit involving determination of liability of various parties in connection with corporation's guaranty of payment of such contracts, under record showing tax was paid under protest but that county treasurer was not a party to the suit (1 Comp. Laws 1929, § 3641).

8. GUARANTY—CONSTRUCTION—DAMAGES.

Contract of guaranty whereby the guarantor agreed that in case the principal obligation should become in default guarantor would either repurchase it or would substitute for it a non-defaulted obligation carrying a like guaranty is construed as in effect a guaranty that the principal obligation would eventually be paid and upon guarantor's failure to sustain its burden of showing whether alternative of replacement or repurchase would result in smaller recovery, it may not complain of court's finding as to damages in accordance with obligee's testimony, the credibility of which was not attacked.

9. EQUITY—ACCOUNTING—ADEQUATE REMEDY AT LAW.

Contention that plaintiff who had purchased the vendor's interest in a number of land contracts from defendant corporation which gave a guaranty of repurchase or replacement by a contract carrying a similar guaranty had an adequate remedy at law and that court of equity had no jurisdiction *held*, without merit where plaintiff sought an accounting as to collections made by defendant corporation and for other relief, no motion

to dismiss was made and court had jurisdiction of the parties and the subject-matter.

10. CORPORATIONS—CANCELLATION OF SUBSCRIPTION—PURCHASE OF OWN STOCK.

A corporation can neither cancel a subscription to its capital stock nor purchase shares of its own stock to the prejudice of the rights of creditors but may lawfully repurchase its own stock providing it is made from surplus.

11. SAME—SURPLUS.

The surplus of a corporation is available for use in whatever manner the corporation sees fit to use it without impairing its capital structure and without prejudice to the rights of creditors.

12. SAME—CANCELLATION OF SUBSCRIPTION—PREJUDICE—GUARANTY.

Finding of liability on part of stockholder for balance of subscription *held*, erroneous, where cancellation of subscription was effected by release of subscriber from liability for such stock which was then placed in corporate treasury at a time when the stock was worth more than par, corporation's current assets were more than four times its current liabilities, business was operated on successful and profitable basis, the repurchase was fair and not prejudicial to rights of plaintiff, none of whose land contracts, purchased from defendant corporation which had, in effect, guaranteed their payment, were in default.

13. SAME—REPURCHASE OF STOCK—GUARANTY—DAMAGES.

Repurchase of $4,900 of corporate stock from stockholder, who desired to enter business for himself, on a buy or sell basis, at a time when corporation had surplus of about $60,000 and current assets of more than seven times its current liabilities *held*, not to subject such stockholder to liability for damages incident to suit against corporation on contract of guaranty, notwithstanding principal obligations were in default in such an amount that plaintiff sustained damages in the sum of $2,800 as determined 3 or 4 years later.

14. SAME—DECLARATION OF DIVIDENDS—LIABILITY OF DIRECTORS TO CREDITOR.

Declaration of dividends by directors when current assets were more than seven times the amount of the current liabilities and surplus remaining exceeded amount later found to have been due plaintiff on corporation's contract of guaranty *held*, not

to render directors subject to liability for amount of dividends so declared since corporation was not insolvent before or after payment of the dividends.

15. SAME—INSOLVENCY—EVIDENCE.

In suit for accounting to plaintiff for alleged losses sustained under purchase of vendor's interests in a number of land contracts from defendant corporation which guaranteed their payment by optional guaranty of repurchase at price sold less payments or substitution of nondefaulted contract, claim that defendant corporation was insolvent at time certain dividends were declared and other alleged depletions made of corporate assets in that corporate balance sheets were incorrect *held*, not sustained by evidence.

16. EVIDENCE — ECONOMIC DEPRESSION — VALUES — CORPORATE OFFICERS.

It is now a matter of common knowledge that assets, consisting of mortgages and vendor's interest in land contracts, greatly depreciated in value between 1931 and 1933 although a court would not be justified in finding that in 1931 the officers of a corporation dealing in such securities should have anticipated such great depreciation and actions of such officers should be viewed from the then present appearances.

Appeal from Wayne; Richter (Theodore, J.), J. Submitted June 15, 1938. (Docket No. 32, Calendar No. 39,931.) Decided February 2, 1939.

Bill by Thomas P. Myers against C. W. Toles & Company, a Michigan corporation, Charles W. Toles, Harold L. Wadsworth, Herbert H. Upton, Frank P. Book, Norman C. Frealig, Grace S. Toles and Toles Management Company, Inc., a Michigan corporation, to recover dividends alleged to have been illegally declared, for an accounting under a contract of guaranty and for other relief. From decree for plaintiff against C. W. Toles & Company and Charles W. Toles only, plaintiff appeals and they cross-appeal. Reversed as to defendant Charles W. Toles. Otherwise affirmed.

*Lucking, Van Auken & Sprague,* for plaintiff.

*Harold A. Sleeper (Miller, Canfield, Paddock & Stone, Louis H. Fead* and *W. Brace Krag,* of counsel), for defendants C. W. Toles & Company, Toles Management Company, Inc., Frealig and Toles.

*Bulkley, Ledyard, Dickinson & Wright (Edgar C. Howbert,* of counsel), for defendants Wadsworth and Book.

CHANDLER, J. C. W. Toles & Company was incorporated under the laws of this State on November 24, 1926, to conduct a general brokerage business in securities, including land contracts and mortgages, to buy, sell, lease and improve real estate, and to act as agents, managers or brokers in connection with the establishment and promulgation of corporations, associations or any other form of business enterprise. The total authorized capital stock of the corporation was 3,000 shares of no par value stock, 1,000 shares thereof to be known and classified as class "A" stock, and 2,000 shares to be known and classified as class "B" stock. The price of the class "A" stock was fixed by the articles of association at $100 per share, and the price of class "B" at $1 per share. Class "A" was a preferred stock and entitled to receive dividends at the rate of $7 per share annually and no more before declaration of dividends on class B stock, and in case of liquidation or dissolution, was entitled to be paid in full out of the assets whether capital or surplus, at the rate of $100 per share together with any unpaid cumulative dividends, if capital and surplus was sufficient.

Article 5 of the articles of association shows that all of the authorized capital stock was subscribed and that the subscription for 500 shares of class A stock was fully paid for in cash in the amount of $50,000. The articles of association, by the filing thereof with the secretary of State and the county clerk of Wayne county, where the office of the corporation was located, became, of course, a matter of public record.

Defendant Charles W. Toles subscribed for 501 shares of class A stock and for 1501 shares of class B stock but did not pay in full therefor at the time of subscription, and in fact never paid his subscription for 480 shares of the class A stock and for 940 shares of class B stock, having been released therefrom by action of the stockholders as will be later discussed. He paid for 1,000 shares of class B stock, not in cash, but by a management contract entered into with the corporation whereby Toles eventually received 501 shares and other stockholders received 499 shares. This distribution was made because it was originally intended by the incorporators that 1,000 shares of the class B stock should not be paid for in cash but should be given to the subscribers as a bonus. They were afterwards advised that the corporation could not issue bonus stock, and Mr. Toles thereupon gave to the original subscribers one share of class B with each share of class A that was paid for, the distribution thus made being out of the 1,000 shares that were issued to Toles as a part of the consideration for the management contract that he made with the corporation. It fairly appears that these shares, in addition to another 60 shares purchased by Toles, was the only class B stock that was ever issued.

Defendants Charles W. Toles, Harold L. Wadsworth, Herbert H. Upton, Frank P. Book, together

with others who are not parties to this litigation, were the original incorporators of C. W. Toles & Company. The above named individuals were the first officers and directors, and, with the exception of Mr. Upton, continued as such until the filing of the bill of complaint herein on September 7, 1932. Mr. Upton disposed of his stock in August, 1930, and was succeeded on the board of directors by defendant Norman C. Frealig. Mr. Toles was president and manager of the corporation, and undoubtedly the dominant factor therein.

Shortly after the incorporation of the company, and prior to the commission of any of the acts complained of by plaintiff, defendant Toles acquired by purchase the holdings of one George Sloan, an original incorporator who owned 250 shares of class "A" stock and an equal number of class "B" shares.

The corporation immediately after its organization engaged in the purchase and sale of net equities in land contracts, mortgages and other securities, and seems to have restricted itself to these operations during the period of its existence. The record discloses that the business from its inception up to and including the year 1930 was operated on a very successful and profitable basis.

For the year ending December 31, 1927, the net income of the corporation was 22.55 per cent. of its outstanding capital stock and it paid a dividend of 6.64 per cent. For the year ending December 31, 1928, its net income was 58.93 per cent. and it paid in dividends 21.78 per cent. For the six months ending June 30, 1929, its net income was 17.88 per cent. and it paid in dividends 13.41 per cent. The balance sheet of June 30, 1929, revealed a strong financial condition and showed an undistributed surplus balance of $33,460.99, or 63.06 per cent. of the outstand-

ing capital stock. In addition, it had a reserve of $22,500 which had been provided for collection expenses and losses.

The record discloses that a special meeting of the stockholders of the company was held on July 1, 1929, at which all shareholders were present, and the minutes of said meeting show unanimous affirmative ✓ action on the following resolution:

"Whereas, upon the organization of C. W. Toles & Company, Inc., Mr. C. Wallace Toles subscribed for 501 shares of class A stock in this corporation at a price of $100 per share, and 1501 class B shares of said stock at a price of $1 per share, as appears from the articles of association of said corporation executed upon November 18, 1926; and

"Whereas, since the organization of said corporation said C. Wallace Toles paid in the price of 561 of class B shares subscribed for by him, as appears from the books and records of this corporation, but has never paid in the price of the balance of the 940 class B shares in said stock subscribed for by him, as aforesaid; and

"Whereas, upon the organization of this corporation said C. Wallace Toles paid in the price of 21 of said class A shares, as appears from the books and records of this corporation, but has never paid in the price of the balance of class A shares subscribed for by him as aforesaid, or any part thereof; and

"Whereas, it was determined by resolution duly adopted at the annual meeting of the board of directors of this corporation held January 10, 1928 that said C. Wallace Toles should have the right and option to make payment for the balance of his said subscription to class A and class B shares of stock in this corporation at any time within one year from the date of said meeting, as appears from the records and minutes of said meeting; and

"Whereas, said C. Wallace Toles has never accepted nor received any dividends upon said unpaid shares in the stock of this corporation subscribed for by him, or accepted or derived any other benefits therefrom or exercised the option therein mentioned granted to him by the board of directors of said corporation at the annual meeting held January 10, 1928, to pay for said shares within one year from said date; and

"Whereas, said C. Wallace Toles has stated to the stockholders at this meeting convened that he feels it would now be unfair for him to purchase or accept said unpaid shares in the class A and class B stock of this corporation at the price at which he subscribed for the same because of the great increase in value of said shares since the organization of this corporation, and from other motives of fairness and generosity, has elected to release his rights to said shares and to resell the same to the corporation at the price at which he subscribed for the same, such price to be paid solely through the release of the said C. Wallace Toles from any and all liability upon account of his subscription for said shares; and

"Whereas, it is manifestly beneficial to this corporation to accept said offer made by said C. Wallace Toles; and

"Whereas, as appears from the books and records and the financial statement of this corporation, the gross assets thereof as of the date of this meeting amount to not less than $131,344.29 and the aggregate amount of any and all liabilities of the corporation as of the date hereof (including all issued or subscribed capital stock) do not exceed the sum of $97,324.14, and the net assets or surplus of the corporation as of the date of this meeting are not less than the sum of $34,020.15; and

"Whereas, it appears that the surplus or net assets of the corporation are now in excess of the amount required to accept said offer hereinabove

mentioned made by said C. Wallace Toles and repurchase at the original subscription price thereof said unpaid class A and class B shares in the stock of this corporation subscribed for by said C. Wallace Toles, as hereinabove stated;

"Now therefore, be it

"Resolved, that C. W. Toles & Company, Inc., does hereby accept the offer of said C. Wallace Toles to sell, assign and transfer to it all his right, title and interest in and to said 480 shares in the class A stock and 940 shares in the class B stock of this corporation subscribed for by him upon the organization thereof but never paid in by him, together with any and all dividends which may have heretofore been declared to be paid or become payable upon said shares, at the original subscription price of said shares, and that payment for the repurchase of said shares by the corporation from said C. Wallace Toles at the price or prices aforesaid be made from the net assets or surplus of this corporation, and that payment for said shares at such prices be made by and through the release of said C. Wallace Toles of and from any and all liability on account of his subscription for said shares; and be it further

"Resolved, that this corporation, by and through its proper corporate officers, shall execute and enter into an agreement with said C. Wallace Toles in such form as the board of directors of this corporation may in their discretion approve or authorize to be executed by said officers on its behalf, providing among other things, for such release of said C. Wallace Toles from any and all liability on account of his subscription to said shares; and be it further

"Resolved, that said shares in the capital stock of this corporation purchased or repurchased by it from said C. Wallace Toles in pursuance of this resolution, shall not be cancelled or retired but shall be held in the treasury of the company as treasury stock

until the further order of the board of directors; and be it further

"Resolved, that the board of directors of this corporation be and they hereby are authorized and empowered to take any and all such action as they may deem best for the purpose of carrying out this resolution and the purposes thereof."

A special meeting of the board of directors followed the stockholders' meeting at which all directors were present, and unanimous affirmative action was taken which rendered effective the resolution of the stockholders, and in consideration of which C. W. Toles executed the following release:

"For and in consideration of the release of the undersigned C. Wallace Toles from and of any and all liability upon account of the subscription by him of 480 shares in the class A stock of C. W. Toles & Company, Inc., and 940 shares in the class B stock of said corporation, the undersigned C. Wallace Toles does hereby sell, assign and transfer unto C. W. Toles & Company, Inc., said shares in the capital stock of said corporation."

The balance sheet of the company as of December 31, 1929, shows current assets of $134,123.99 and current liabilities of $18,767.83, a reserve for expenses of $21,500.59 and a surplus balance of $39,605.33.

On August 30, 1930, at a special meeting of the board of directors, defendant Upton, who was vice-president and active in the affairs of the company, tendered his resignation as a member of the board for the announced reason that he had formed a company of his own, and his resignation was by resolution accepted to take effect immediately. Defendant Frealig was then elected a director and vice-president to take Mr. Upton's place. The minutes of this

meeting show that after the selection of Mr. Frealig as a director, the following resolution was adopted:

"Resolved: That a dividend of $25 per share upon the class B stock, payable to holders of record of said stock as of October 10, 1930, and that the officers of the corporation be and are hereby directed to pay the same as of such date."

The minutes of this meeting also show that,

"The secretary advised the meeting that Mr. Herbert H. Upton, whose resignation as a director and vice-president of the company had been tendered and accepted at this meeting, was willing to sell 49 shares in the class A stock of the company to the company at a price of $100 per share. The secretary stated that such price was the actual value of the stock and that such offer was made by Mr. Upton because he felt that it was not fitting that he should retain such stock after severing his relations with the company and that it was proper that he offer to resell the stock to the company at the price at which it was paid in;

"The treasurer stated that the financial statement of the company disclosed that a surplus, as of the date of this meeting, of not less than $30,000 or more than sufficient to enable the company to purchase said stock from surplus.

"Upon motion duly made, seconded and carried, it was unanimously

"Resolved, that this company repurchase from Herbert H. Upton said 49 shares of its class A no par value stock at a price of $100 per share or a total price of $4,900 and that the officers of the company be and they hereby are authorized to pay said amount to said Herbert H. Upton from the funds of this corporation upon receiving the certificate evidencing said 49 shares of class A stock duly indorsed, and

"Resolved, further, that such shares of stock so repurchased by this company shall not be cancelled

or retired but shall be held in the treasury of the company as treasury stock until the further order of the board of directors.''

Mr. Upton claims that at the time he sold his stock he supposed he was selling the same to C. W. Toles; that he received $100 per share for his class A stock and that he sold 149 shares of class B stock to C. W. Toles for which he received the sum of $32 per share. He testified:

''My stock * * * in the C. W. Toles & Company at the time I left I sold to C. W. Toles. He wanted a proposition where either I would buy him out or he would buy me out. I made a proposition to buy him out which he accepted to buy me out on. I gave a figure at which I would either· buy or sell. The figure was par for the preferred stock—the A stock— and $32 per share for the B stock.''

The balance sheet of the corporation as of August 31, 1930, shows current assets of $128,806.41, current liabilities of $16,710.25, a reserve for deferred expenses of $20,889.29 and a surplus balance of $37,542.

The balance sheet of October 31, 1930, being subsequent to the payment of the dividend authorized at the meeting of the board held August 30th, shows current assets of $85,771.21, current liabilities of $6,886.48, reserve for deferred expenses of $20,445.20 and a surplus balance of $9,808.63.

The balance sheet of March 31, 1931, shows current assets of $81,909.59, current liabilities of $11,202.66, reserve for deferred expenses of $18,816.47 and a surplus balance of $4,141.72.

At a meeting of the board of directors held on April 6, 1931, at which all directors were present, the following resolution was unanimously adopted.

"Resolved: That a dividend of $15 per share upon the class B stock payable to the holders of record of said stock as of April 6, 1931, and that the officers of the corporation be and are hereby directed to pay the same as of such date."

The balance sheet of April 30, 1931, shows current assets of $80,528.89, current liabilities of $12,820.95, reserve for deferred expenses of $18,822.62 and a surplus balance of $1,519.23.

The balance sheet of May 31, 1931, after payment of the dividend declared April 6th, shows current assets of $72,907.72, current liabilities of $22,231.33, reserve for deferred expenses of $1,952.02 and a surplus balance of $608.28.

The significance of the foregoing data will become apparent in the further statement of facts and the discussion of the questions involved in this appeal.

In December, 1928, plaintiff desired to make some investments in land contracts on Detroit real estate, and discussed with Mr. C. W. Toles, president and manager of C. W. Toles & Company, the proposition of purchasing contracts from this corporation. After some discussion, plaintiff made a written proposition to purchase contracts of the company, providing there should accompany each contract a certain written guaranty. This proposition proved acceptable and on December 18, 1928, plaintiff purchased 18 contracts for the sum of $48,000. The agreement prepared by plaintiff was as follows:

"In consideration of the purchase price of any and all land contracts sold to you on or after this date, we agree to furnish the following services to the best of our ability:

"Without further charge except as hereinafter stated, we will collect all payments and either remit

them to you or credit them to your account, as per your instructions; supervise insurance on the properties by seeing that the proper amount is carried and that the policies are kept in force. We will attend to principal and interest payments on your mortgages and refinance them when necessary or advisable at the lowest terms of cost that we can obtain. You will get all benefits derived from such refinancing and your account will be charged with the expense to us, if any.

"All properties covered by contracts sold to you will be appraised by either George Van Buren or myself, or both of us.

"Before we purchase any land contracts which are sold to your account, we will (1) carefully investigate the vendee, (2) get a legal opinion from an attorney, one who meets with your approval, showing marketable title to the property, (3) furnish a certificate of survey, (4) investigate to see that all bills for material and labor have been paid when the contract covers a new house, (5) get an acceptance of the property from the vendee, (6) investigate the status of the first mortgage and check special and general taxes, (7) have the legality of the transaction passed upon by our attorney.

"After your contracts are paid for, we will deliver to you all papers necessary for the passing of title and especially, warranty deeds, original contract, contract assignments, certificate of survey and legal opinion showing marketable title.

"You will be furnished with a statement of your account monthly. On payments received during the month you will be credited for the balance of the month at four per cent. We will charge you at the rate of six per cent. on the moneys loaned your account by this company.

"This arrangement can be terminated by you upon 10 days' written notice, providing all sums due us are paid. In such case we would turn over to you all papers and records of your account, but we would

not be obligated to perform further service in connection with said account.

"With each land contract delivered to you, we will give you a written guaranty reading as follows:

"In consideration of the purchase price of ——— paid to us by you for land contract covering property at ———, we agree, that in the event of the default in the payment of any instalment of principal, interest or taxes falling due under this land contract, and if such default should continue for a period of 90 days, we will take back the defaulted contract and assign and deliver to you a substituted land contract in good standing and which never has been in default; the said substituted land contract shall, or as near as possible, have a balance due as is due on the original land contract and which balance shall be payable upon substantially the same terms as the original land contract and the substituted land contract shall be delivered to you at such a price, that the return to you from the same, taken together with the return already received from the original land contract, shall net you the same return that you would have received had no default occurred in the original land contract—or we will at our option, refund to you your original investment, less all payments received by you on such contract, together with six per cent. interest on balance from date of default. In case of replacement, any difference between the price of the substituted land contract and the balance unpaid on the contract and to which you are entitled upon surrendering the original land contract, shall be adjusted by cash payment made either by ourselves or by you, as the case may be.

"It is expressly understood that the above guaranty shall remain in force only so long as you are willing to permit the above mentioned land contract or substituted contract to be serviced by us and collections made by us, which will be done without fur-

ther charge to you. The substituted land contract to carry with it this same guaranty.''

The written guaranty provided for in the foregoing document was attached to each contract purchased by plaintiff. On the date of the purchase, plaintiff paid to defendant corporation the sum of $30,000. He made subsequent payments during the year following, bringing the total payments on the first purchase to $46,000, and in March, 1931, paid an additional $2,000. He had, however, prior to March, 1931, purchased other contracts of the corporation on credit, securing the payment thereof and of the balance due on the original purchase, by deposit of certain contracts with defendant corporation as collateral.

The defendant corporation claimed that it did not make a practice of giving any guaranty with contracts sold to its customers, although it was its practice to repurchase or replace defaulted contracts with contracts not in default, and that this custom had proved profitable.

It was claimed by plaintiff that Toles & Company had sold to one Herbert Lamb land contracts of the approximate value of $179,000 on which a guaranty similar to that given plaintiff had been made. There is nothing in the record to substantiate this claim. The record does show that there was a dispute between Mr. Lamb and the company, and that the latter, in May or June, 1931, repurchased land contracts of Lamb of the face value of approximately $150,000 for the sum of $100,000, giving a note in payment thereof. We are convinced that these land contracts carried no guaranty of replacement or repurchase. The record discloses but three or four instances wherein guaranties had been given to others than

plaintiff, but they were small in amount and are of minor importance in this discussion.

The net profits of the company from the time of its incorporation to the end of the year 1931 were $89,605.81, and the amount paid out in dividends during that period totaled $82,137.83.

We have called attention to the item of reserve for deferred expenses as shown by the balance sheet. This reserve was created because the corporation had been advised by its auditors to set up the same with the expectation that additional income tax deductions might be obtained in that way, and the income tax lowered. Later, the internal revenue department, having made a ruling which prohibited such a deduction being taken, and the reserve having been created out of the earnings on the basis of the number of contracts sold, and the corporation never having been called upon to use any part of this reserve for expenses, collections or losses, it was treated and considered as a part of the surplus account of the corporation. Certified public accountants testified that it was proper to transfer all or any part of said reserve to the surplus account at any time the company chose to do so. As witnesses for the corporation, they also testified that up to March 31, 1931, the company had reacquired from contract purchasers a total of 32 contracts and had disposed of the same prior to the date mentioned, resulting in a net profit to the corporation of $3,059.12, and that other contracts had been acquired and sold between August 30, 1930 and March 31, 1931 at a net profit of $303.65.

At the time of the release of defendant Toles from his subscription to the capital stock, none of plaintiff's contracts were in default. At the time of pay-

ment of the August, 1930, dividend there were but five of plaintiff's contracts in default, on one of which the court in 1937 assessed his damages at $500, one at $650, one at $750, one at $900 and one at $1,350, or a total of $4,150. At the time of the payment of the April, 1931, dividend, four additional contracts had gone into default, on one of which the court assessed damages at $825, one at $950, one at $3,150 and one at $2,300, or a total of $7,225. The remainder of plaintiff's contracts defaulted at various dates thereafter between August, 1931, and November, 1932, on the whole of which his damages were assessed at the sum of $36,486.10, said assessment being made as of 90 days after the date of the breach of each guaranty, and interest was allowed at the rate of five per cent. per annum from 90 days after the date of such breach to January 1, 1937.

The court also found that the defendant corporation had appropriated income it had received from collections on plaintiff's contracts between March 1, 1933, and January 1, 1937, in the sum of $11,028.71, and allowed plaintiff this amount with interest at the rate of five per cent. per annum from March 1, 1933, to January 1, 1937. Also allowed as an element of damages, was an item of interest charged to plaintiff by the corporation in the sum of $1,110.11 between March 1, 1933, and January 1, 1937.

On the date of the release of defendant Toles from his subscription, the corporation had a surplus of $33,460.99, and a reserve for collection expenses and losses amounting to $22,150, which reserve was afterwards transferred to the surplus account, making a total surplus of $55,610.99, the same being in excess of the total amount of plaintiff's investment in land contracts of the corporation at that time.

During a considerable period preceding May 14, 1931, plaintiff and defendant Toles as a representative of the corporation, had numerous conferences relating to the contracts that were in default, and on this date the following agreement was made between plaintiff and the corporation:

"C. W. T. Co. to take back and replace one or more land contracts each month commencing May (1931) —contracts six months or more delinquent to be replaced first—New contract to comply with terms of written agreement between C. W. T. & Co. and T. P. M. covering replaced land contracts—$100 debit chgd. against T. P. M. to be credited at once if it has not already been credited."

In pursuance of this agreement, the corporation substituted two nondefaulted contracts for contracts that were in default, but later declined to make any more substitutions, and on September 7, 1932, plaintiff made the following demand upon the corporation:

"Until the matters in dispute between us are settled or adjusted, it is my wish that the collections on my land contracts be made by Upton-Riggs & Company. This action on my part is made necessary by your repudiation of your contract obligations to me.

"You are hereby notified to turn over all papers, records and accounts in your possession referring to my land contracts to Upton-Riggs & Company, as well as any funds on hand belonging to me upon demand by Upton-Riggs & Company."

Pursuant to this demand, certain of said contracts were delivered to plaintiff and others were retained by the corporation, it claiming a lien upon them for an alleged indebtedness from plaintiff to it. On this

same date, September 7th, plaintiff instituted this suit, and the hearing thereof was commenced June 21, 1933.

The defendant corporation assigns as its reason for refusing to substitute contracts as per its agreement that the plaintiff was indebted to it during the period covering the transactions for the balance of the purchase price of said contracts, and the record discloses that on May 1, 1931, he was indebted to the company in the sum of $9,262.51, and as of May 1, 1932, owed $3,237.53.

The company contends that plaintiff's action, in taking contracts from its possession after its breach of the agreement, constituted a breach of contract on the part of plaintiff and that because thereof recovery is barred. We are not in accord with this contention, but find that after default by the corporation, plaintiff had a right to demand and receive the contracts without waiving any of his rights.

The plaintiff brought this suit by bill in equity against the defendant C. W. Toles & Company for an accounting for moneys collected by it, and also for an accounting for damages occasioned by breach of the contract of guaranty; against Charles W. Toles to subject him to liability on his unpaid subscription for stock in the corporation, for the illegal authorization and payment of dividends as a director of the corporation and for illegal authorization and receipt of exorbitant salaries; against defendants Harold L. Wadsworth, Herbert H. Upton, Frank P. Book and Norman C. Frealig as directors for illegal authorization and payment of dividends as directors of the corporation, and for the alleged illegal refunding of the Upton preferred stock; and against Grace S. Toles and the Toles Management Company for alleged conveyances and transfers of property to them by the corporation in fraud of the rights of

plaintiff as a creditor. The defendants filed answers denying the material allegations in plaintiff's bill, and the case was submitted upon the pleadings, testimony taken before a commissioner of the court, the report of the commissioner and upon proposed findings of fact and conclusions of law filed by all of the parties. The trial court entered a decree in favor of plaintiff and against the defendant corporation for $48,624.92, being a sum found due him on an accounting and as damages for the breach of the guaranty contract. The court also decreed that the release of Charles W. Toles from his subscription for stock in the corporate defendant was unlawful, and that he should pay the corporation the sum of $48,940 within 30 days from the date of the decree, together with interest thereon at the rate of five per cent. from January 1, 1929, which sum was to be subjected to the payment of plaintiff's claim, and that plaintiff's bill of complaint as to the other defendants should be dismissed.

From this decree plaintiff appeals, and the corporate defendant and Charles W. Toles have filed cross-appeals.

Plaintiff insists that the court erred in not holding defendant Charles W. Toles liable for assets withdrawn through illegal dividends and exorbitant salaries. There is nothing to indicate that the corporate defendant paid or that defendant Toles received an exorbitant salary. This action was not brought against defendants as stockholders to recover dividends illegally paid to them. The statute, 2 Comp. Laws 1929, § 10018, since repealed, creates the liability, and 3 Comp. Laws 1929, §§ 14480–14492 (Stat. Ann. §§ 27.1380–27.1392) provides the proceedings for the enforcement of the individual liability of stockholders. The provisions of the statute were not followed here.

Plaintiff claims error for failure of the court to hold the defendants Book and Wadsworth liable for payment of illegal dividends and negligent management. There is no liability in this proceeding for receipt of dividends, and the liability of these defendants and others, as directors, for negligent management will be discussed later.

Plaintiff also insists that the court was in error in not holding defendants Grace S. Toles, the Toles Management Company and Mr. Upton liable because they received corporate assets. We find no instance in the record showing that Grace S. Toles or the Toles Management Company received any of the corporate assets without adequate consideration, nor were there any dealings between them and the corporation that were prejudicial to plaintiff. The dealings of the corporation with defendant Upton will be later discussed.

Plaintiff further complains of the ruling of the court requiring the payment of the tax imposed by 1 Comp. Laws 1929, § 3641 (Stat. Ann. § 7.422), on the land contracts, being exhibits 2 to 22, inclusive, which were offered in evidence by plaintiff and asks for a declaration by this court that such contracts were not subject to such tax. The record shows that the tax was paid by plaintiff under protest to the county treasurer. The county treasurer is not a party to this proceeding, and we, therefore, decline to express any views on the question.

Defendant C. W. Toles & Company insists that the lower court was in error in the method of computing damages for breach of its contract of guaranty with plaintiff, and takes the position that where an obligor has the option of performing a contract in one of two ways, the obligee is entitled to damages only in accordance with the alternative that will result in the smaller recovery, and that in this instance

the correct measure of damages, if any, was the difference in value between a nondefaulted contract and a defaulted one of approximately the same amount, terms and conditions. This would be true were it not for the agreement made by the corporation that each substituted contract should carry with it the same guaranty of substitution as the original contract, and we must hold that this agreement was in effect a guaranty by the corporation that plaintiff's contracts would eventually be paid. The rule contended for by the corporate defendant that where an obligor has the option of performing in one of two ways that the obligee is entitled to damages only in accordance with the alternative that will result in the smallest recovery is not questioned. Here, the obligor had the option of repurchasing the contract for the amount of the original investment, less payments received, or to substitute a nondefaulted contract which carried with it a similar guaranty, and plaintiff is only entitled to recover in accordance with that obligation that would result in the smallest recovery. However, we are unable to determine, and we believe the trial court was confronted with the same difficulty, which alternative would result in the smallest recovery. We think the burden is upon the corporate defendant to furnish this information to the court. This it failed to do, but contented itself by insisting that the trial court's method of arriving at plaintiff's damages was absolutely wrong.

Defendant and cross-appellant, C. W. Toles, insists that the plaintiff, not being a creditor of the corporation at the time of the cancellation of his unpaid stock subscription, cannot now complain of such action. He also takes the position that the plaintiff, in view of the fact that before he made his initial investment with the corporate defendant, investigated the company and found that $50,000 of

the stock subscribed for by Charles W. Toles had not been paid for, is estopped from holding such stockholder for unpaid subscription balances. Defendant Toles, also claims, that at the time of the cancellation of his stock subscription, the corporation had more than a sufficient surplus on hand to have enabled it to have repurchased the stock defendant had subscribed at the subscription price, and that in view of the sound financial standing of the corporation at the time of such release, the action was not in fraud of the rights of any creditor. He also argues that at that time there were no creditors of the corporation in any substantial amount.

The first question to be discussed is the liability, if any, of the defendant corporation to plaintiff for breach of its contract to repurchase or substitute nondefaulted contracts for defaulted ones, and the correctness of the trial court's method of measuring damages.

There is nothing about the contract that is ambiguous. It is clear that the corporation bound itself to take back from plaintiff land contracts that were 90 days in default and substitute therefor contracts that had never been in default, and which were to be, as near as possible, equal in amount, conditions and terms to the defaulted one, or it would refund, at its option, plaintiff's original investment, less payments received by him. The substituted land contracts were to carry this same guaranty. The corporation was in a much better position to determine which alternative would be most advantageous to it. The burden was upon it so to show, and it failed to meet this burden. It also failed to attack the credibility of the testimony upon which plaintiff relied to establish his damages. We hold that the court was correct in his method of measuring the damages and affirm the award decreed by him.

The contention of C. W. Toles & Company that plaintiff had an adequate remedy at law and that equity had no jurisdiction is without merit. Plaintiff sought an accounting and other relief. No motion to dismiss was made. The case was heard and submitted upon the merits. The court had jurisdiction of the parties and the subject-matter.

The next question to be considered is the correctness of the court's decree holding defendant and cross-appellant, Charles W. Toles, liable on his original subscription for stock in C. W. Toles & Company. The plaintiff insists that the action of the corporation, by the resolutions hereinbefore referred to, was in effect a release without consideration of Toles from his obligation to pay his stock subscription. Toles contends that this action was a repurchase of the stock by the corporation at a time when it had ample surplus with which to make the purchase and complete the transaction. We fail to see where the cancellation of a subscription differs from a purchase by the corporation of shares of its own stock. It can do neither to the prejudice of the rights of creditors. The resolutions adopted by the shareholders and the board of directors relative to this transaction makes it clearly apparent that all of the parties intended and treated the transaction as a purchase from Toles of his stock by the corporation. We have held that a corporation may lawfully repurchase its own stock, providing the purchase is made from surplus. *Barden* v. *A. Heller Sawdust Co.,* 240 Mich. 549, and cases cited therein. See, also, 6 Fletcher on Corporations (Perm. Ed.), pp. 754–759; *Rasmussen* v. *Schweizer,* 194 Wis. 362 (216 N. W. 481). At this time, C. W. Toles & Company had a surplus, including reserve for collection expenses and losses, which we hold was properly treated as surplus, of upwards of $55,000. This

amount was available for whatever purpose the corporation saw fit to use it without impairing its capital structure and without prejudice to the rights of creditors. It could have paid it out to stockholders in the form of dividends or could have used it to purchase its own stock. Its solvency at this time is not questioned, and nothing in this transaction either rendered or tended to render it insolvent. None of plaintiff's contracts were in default. The corporation's current assets were more than four times its current liabilities. Its business was operated on a very successful and profitable basis, and the stock which Toles sold to it was worth more than par, based on earnings and assets. The record discloses that the repurchase was in all respects fair, was not prejudicial to the rights of plaintiff, and was in reality advantageous to the corporation. We therefore hold that the finding of the trial court that defendant Toles is liable to the C. W. Toles & Company to the amount of the unpaid subscription on his stock must be reversed.

The next question presents the liability of defendant Upton on the alleged refunding of his preferred stock in the corporation by action of the board of directors under date of August 30, 1930. Upton desired to enter business for himself and was willing to sell his preferred stock to the corporation or to Toles at par and his common stock for $32 per share, or, in the alternative, he would purchase the Toles stock at this price thus giving him control of the company. The corporation, by action of its board, purchased his preferred stock at $100 per share and C. W. Toles purchased his common stock at $32. This is quite conclusive evidence of the value that Toles and Upton who were most familiar with the affairs of the corporation, placed upon the assets

and business of the company. The balance sheet at this date showed current assets of more than seven times the current liabilities. There was a surplus of about $60,000. Four of plaintiff's contracts were in default on which the court three or four years later assessed damages at $2,800. We must hold that the transaction between the corporation and Upton did not constitute a refunding of the Upton stock, but was a purchase by the company of such stock, and that both parties to the transaction were within their legal rights.

We are now concerned with the question of the liability of defendants Toles, Upton, Wadsworth, Book and Frealig as directors for the declaration and payment of dividends of $25 per share on the common stock as of August 30, 1930, and $15 per share as of April 6, 1931. The following questions are presented: Was the corporation insolvent when the dividends were declared and paid? Did the declaration and payment of the dividends render the company insolvent? Did the directors at the time of the declaration and payment of such dividends know that the corporation was insolvent, or that such action would render it insolvent? If these questions can be answered in the affirmative, the defendants mentioned must be held liable under the provisions of 2 Comp. Laws 1929, § 10019 (since repealed). If answered in the negative, there is no liability.

In the preceding paragraph we have discussed the financial condition of the company as of August 30th, the time of the purchase of the Upton stock and the declaration of the $25 per share dividend. At the time of the declaration of the dividend on April 6, 1931, the current assets of the corporation were more than seven times the amount of the current liabilities, and the company had a surplus of $22,958. At

this time, plaintiff had a total of eight contracts in default on which the court subsequently awarded him damages in the total amount of $10,025. After the payment of the April dividend, as shown by the balance sheet, it had assets in excess of its liabilities, other than its liability to plaintiff in excess of the sum of $50,000. The court found that the company was indebted to plaintiff for breach of guaranty contracts in the sum of $36,486.10. Treating this whole sum as a liability on the part of the corporation, it was not insolvent at the time of the payment of the dividends and the payment thereof did not render the company insolvent. The other items which make up the amount awarded plaintiff against the company consist of income appropriated by it from collections on plaintiff's contracts between March 1, 1933 and January 1, 1937, and for interest charged by the company against plaintiff during this period.

Plaintiff attacked the correctness of the balance sheets of the defendant corporation, insisting that the item of land contracts was carried on the books for an amount much in excess of the value of the contracts as of the date of the balance sheets. An expert witness for plaintiff, Mr. Hahn, testified relative to the value of the contracts and if the court were to adopt his estimate of the difference between the actual value thereof and the price at which they were carried on the books of the corporation as correct, it would show that the company was insolvent at the time of the payments of the dividends of August, 1930 and April, 1931. Twenty-four of the contracts so appraised by Mr. Hahn were sold by the corporation at various dates between 1929 and 1932, and in each instance the price received was far in excess of the value placed upon them by Hahn. We find in one instance an appraisal made by Hahn of

$1,000 as of 1930, the contract being later sold in the same year for $3,044. Another contract that was appraised in 1931 for $1,000 by Hahn was sold during that year for $2,018. Another that was appraised by him in 1931 at $400 was sold in that year for $1,290. One that he appraised in 1930 at $1,000 was later sold in 1930 for $1,914. He appraised a contract in 1931 at $500 which was sold in the same year for $1,533. One appraised in 1931 at $600 was sold in the same year for $2,031. One that he appraised in 1931 for $500 was later sold in that year for $1,653. A contract appraised by him in 1930 at $1,000 was sold in 1931 for $1,914. One appraised by him as of 1929 for $1,576 was sold in 1930 for $2,851. One that he appraised in 1930 for $1,220 was sold in that year for $2,713. He appraised one in 1929 at $1,554 which sold in 1931 for $2,004. We will not continue with these items other than to state that the properties so appraised by Hahn were sold for more than twice the value placed thereon by him, and in excess of the amount that they were carried on the books of the corporation. We must therefore hold that no successful attack has been made upon the balance sheets and that the same must be accepted. These contracts were carried on the books of the company at cost or below, which method met with the approval of certified public accountants produced as witnesses by the company, and which they testified was an approved and conservative method of carrying such items.

It may seem inconsistent to accept the values placed by Mr. Hahn on plaintiff's contracts which were the basis of the award of damages and reject his estimates of the value of land contracts in connection with the attack upon the balance sheets, but when we examine the record we find that defendant

gave no testimony whatever relative to the value of the contracts sold plaintiff, but contented itself with insisting that the trial court's method of arriving at the measure of damages was wrong.

The appraisals made by this witness of plaintiff's contracts and the contracts carried on the books of the company as assets were actually made about 60 days prior to October 31, 1933, the date his testimony was given, but he claims to have appraised plaintiff's contracts as of a date 90 days after default, and the company's assets as of various dates during the years 1929, 1930 and 1931. We are inclined to believe that the estimates of values made by this witness were influenced to a considerable extent by the years of depression occurring prior to the time his testimony was given, during which period values sank to a very low level and in many cases, such as stocks, bonds and land contracts, were entirely destroyed.

The business of C. W. Toles & Company did not appear to be materially affected by business conditions in 1929 and 1930. In July, 1930, the company discontinued selling contracts on credit, and this naturally resulted in loss of business and required less capital. In the latter part of the year 1931, it became evident that the land contract business was being seriously affected. This condition became worse and continued so until June, 1933, when a petition was filed for dissolution of the corporation and the appointment of a temporary receiver. The petition which was filed by the board of directors set forth that the stock, property, and effects of the corporation had been so far reduced by losses that the corporation would not be able to pay all just demands, and that it was deemed beneficial to all concerned that the corporation should be dissolved.

The petition showed assets consisting largely of real estate and land contracts in the amount of $124,-608.61, and showed debts as follows: H. W. Lamb, notes payable, $84,105.64; a Mr. Tobias, $1,900; C. W. Toles for salary due and interest in the sum of $8,344.12, and set forth that T. P. Myers was claiming an amount due him of approximately $38,000 and that a suit was pending disputing his claim. This petition was filed about 26 months after the last payment of dividends by the corporation, and after it had incurred the Lamb liability on the purchase of approximately $150,000 worth of contracts.

It is a matter of common knowledge that assets, consisting of securities of the kind dealt in by the corporation, had greatly depreciated in value between 1931 and 1933. We do not believe the court would have been justified in finding that the officers of the corporation should have anticipated this great depreciation in its assets. To paraphrase the language of Mr. Justice BUTZEL in *Chamberlin* v. *Wagar,* 272 Mich. 594, "On August 30, 1930, and April 6, 1931, it was not known that a further recession in values would occur. It was believed by many that prosperity would shortly return, and that conditions would improve instead of becoming much worse. * * * Its business had been prosperous, its failure more than two years later evidently not being foreseen, it cannot be said that the payment of dividends in August, 1930, and April, 1931, would sometime later render this corporation insolvent." In 1931, the popular opinion still was that prosperity would shortly return, and that conditions would improve instead of becoming worse, but it now appears that this opinion was radically wrong. The actions of the officers of the corporation should be viewed

from the then present appearances and not at a much later time when we are aware of subsequent events.

The decree is affirmed, except as to the liability of Charles W. Toles, and as to him it is reversed. Plaintiff may have costs against C. W. Toles & Company, defendant Charles W. Toles and the remaining defendants and appellees will recover costs against plaintiff.

BUSHNELL, SHARPE, POTTER, NORTH, and McALLISTER, JJ., concurred with CHANDLER, J. BUTZEL, C. J., and WIEST, J., concurred in the result.